IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GOLDEN HOUR DATA SYSTEMS, INC.,   No. C 06-7477 SI

    Plaintiff,   **CLAIM CONSTRUCTION ORDER**

    v.

HEALTH SERVICES INTEGRATION, INC.,

    Defendant.
                                      /

On July 2, 2008, the Court held a claim construction hearing. Having considered the arguments of counsel and the papers submitted, the Court construes the disputed claims as follows.

**BACKGROUND**

Plaintiff Golden Hour Data Systems, Inc. ("Golden Hour") brought suit against defendant Health Care Services Integration, Inc. ("HSI"), alleging infringement of United States Patent No. 6,117,073 ("the '073 patent"). Broadly speaking, the patent is directed to systems and methods for integrating software modules used in connection with emergency medical transportation. HSI denied the alleged infringement of the '073 patent, asserted counter-claims against Golden Hour, including invalidity and unenforceability of the patent, and subsequently moved for summary judgment on the patent's invalidity. The Court denied HSI's summary judgment motion.

After filing a Joint Claim Construction Statement,[1] the parties filed claim construction briefs, seeking to have the Court construe a number of disputed claim terms from the '073 patent.

---

[1] In the Joint Claim Construction Statement, the parties agreed to the construction of a number of claim terms that the Court does not address herein. *See* Docket No. 52.

## LEGAL STANDARD

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, in construing a claim, claim terms are given their ordinary and accustomed meaning unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1584 n.6.

The claims must be read in view of the specification. *Markman*, 52 F.3d at 978. Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187. However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316. Therefore, if the specification reveals an intentional disclaimer or disavowal

of claim scope, the claims must be read consistent with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

## DISCUSSION

**I.   Claims in the '073 patent containing disputed terms**

The parties dispute terms contained within the '073 patent's independent claim 1 and its associated, dependent claims 2, 6 and 8, and independent claims 10 and 15. The claims at issue read as follows, with the disputed terms italicized:

**A.   Independent claim 1**

A computerized *integrated* data management system for tracking a patient incident, comprising:
  a first module *capable of dispatching* an emergency transport crew specific to a patient incident requiring emergency medical care by the emergency transport crew, wherein transportation tracking information relating to dispatch is *recorded*; and
  a second module *capable of* receiving information from the first module and billing the patient appropriately for costs indicative of the patient incident,

3

including transportation costs. '073 patent, col. 20, line 61-col. 21, line 4.[2]

**B.      Dependent claim 2**

The data management system of claim 1, further comprising a third module *capable of* interpreting data relating to the medical condition of a patient involved in the patient incident and determining a diagnosis for the patient.  21:5-8.

**C.      Dependent claim 6**

The data management system of claim 1, wherein the first module includes *instructions for dispatching* a helicopter.  21:18-20.

**D.      Dependent claim 8**

The data management system of claim 1, wherein the first and second modules communicate via a *shared database*.  21:24-26.

**E.      Independent claim 10**

A computerized *integrated* data management system for tracking a patient incident, comprising:
  a first module *capable of* interpreting data relating to the medical condition of a patient involved in a patient incident requiring emergency medical care by an emergency medical crew and determining a diagnosis for the patient, wherein the first module prompts for physical findings relating to a physical examination of the patient at the site of the patient incident; and
  a second module *capable of* receiving information from the first module and billing the patient appropriately for the patient incident.  21:30-41.

**F.      Independent claim 15**

A computerized method of generating a patient encounter record, comprising the steps of:
  collecting flight information relating to an emergency transport crew dispatch;
  collecting patient information from a clinical encounter associated with a patient incident requiring emergency medical care by the emergency transport crew; and
  *integrating* the patient information with the flight information to produce an encounter record indicative of the patient's clinical encounter.  21:54-22:6

---

[2] Citations to the '073 patent are presented with the column number preceding a colon, followed by the line number(s).  Except where otherwise indicated, all further references are to the '073 patent.

**II.    Disputed terms in the '073 patent**

    **A.    "Integrated"**

Independent claims 1 and 10 of the '073 patent both contain the preamble,[3] "A computerized *integrated* data management system for tracking a patient incident, comprising: . . ." 20:61-62, 21:30-31 (emphasis added). Golden Hour contends that "integrated" in this context is an easily understood term that requires no construction, or to the extent it does, the Court should construe the term according to its ordinary and customary meaning.[4] HSI contends that the Court should construe "integrated" as "two or more software modules that share common data as a single logical record." Alternatively, HSI contends that "integrated" is indefinite as used in the '073 patent.

Here, the claim language, including the context of the words surrounding the disputed term, provides substantial guidance as to how persons skilled in the art would understand the disputed term. *See Phillips*, 415 F.3d at 1314; *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.2d 1082, 1088 (Fed. Cir. 2003). The claim language describes an "integrated" computerized data management system comprising a first module that facilitates the dispatch of emergency transport crews and a second module that is "integrated" with the first module such that it is capable of receiving information from the first module. *See* 20:61-21:4, 21:30-41. The '073 patent's specification and its embodiments of the invention ("the specification"), like the claim language itself, describes the system as "integrated" in the sense of multiple modules sharing common data by transferring or transmitting it from one module to another. *See* Fig. 1; 10:38-41, 11:19-26. The specification does not *require*, as HSI advocates, that something "integrated" within the meaning of the invention *must* be "two or more software modules that share common data as a single logical record." In fact, the specification does not mention a "single logical

---

[3] With respect to the preamble, "a preamble generally limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005) (citing *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002). Plaintiff does not dispute that the preamble is limiting in this case.

[4] With respect to the ordinary and customary meaning, Golden Hour cites *The American Heritage Dictionary* (3d ed. 1993), which defines "integrate" as "to join with something else; unite," *American Heritage*, *supra*, at 706, and *McGraw-Hill Dictionary of Scientific and Technical Terms* (5th ed. 1994), which defines "integrated software" as "a collection of computer programs designed to work together to handle an application, either passing data from one to another or as components of a single system," *McGraw-Hill*, *supra*, at 1028.

1 record."[5] HSI does not define "single logical record" or explain the source from which it derived this
2 language. Nothing in the claim language or the intrinsic evidence supports HSI's construction that the
3 modules are "integrated" because they share common data as a "single logical record."

4 In light of the relevant claim language and the specification, the Court agrees with the reasoning
5 of Judge Ward's recent order construing various claims of the '073 patent. Judge Ward held that "the
6 patentee envisioned an 'integrated' system in the sense of the ability to transfer information throughout
7 the various functions of an emergency response." *Golden Hour v. emsCharts*, 2008 WL 2557581, at
8 *6 (E.D. Tex. June 23, 2008). As the Court is persuaded that "one of skill in the art would read the
9 claim in this manner," the Court rejects HSI's proposed construction and adopts Judge Ward's
10 construction of the term "'integrated' to mean 'a system with the capability to transfer information
11 throughout the various functions of an emergency response.'" *Id.*[6]

### B. "Capable of"

14 Independent claim 1 describes a "first module *capable of* dispatching an emergency transport
15 crew. . .[and] a second module *capable of* receiving information. . . ," 20:63-21:1 (emphasis added),
16 dependent claim 2 describes a "third module *capable of* interpreting data. . . ," 21:6-7 (emphasis added)
17 and independent claim 10 describes a "first module *capable of* interpreting data. . .[and] a second
18 module *capable of* receiving information. . . ," 21:32-39 (emphasis added). Golden Hour contends that,
19 as used these contexts, the term "capable of" is easily understood by one skilled in the art to mean "able
20 to." HSI argues that the term is indefinite in these contexts because software systems "are inherently
21 'capable of' many things, including things for which they were never designed or intended." *See* Def.'s
22 Br. at 20.

---

[5] Likewise, the August 18, 1999 amendment filed by Golden Hour during prosecution of the '073 patent, to which HSI also cites as support for its construction, does not state that the multiple modules share common data in the form of a "single logical record."

[6] The Court likewise finds that the term "integrated" is not indefinite, as HSI contends. *Cf. Halliburton Energy Services, Inc. v. M-1 LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008) (holding the term "fragile gel" indefinite because a person of ordinary skill in the art could *not* determine its meaning in context) (emphasis added); *Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371, 1375 (Fed Cir. 2001) (a claim is only indefinite if "reasonable efforts at claim construction prove futile").

6

1        "If the meaning of the claim is discernible, even though the task may be formidable and the
2 conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently
3 clear to avoid invalidity on indefiniteness grounds." *Exxon*, 265 F.3d at 1375. "By finding claims
4 indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory
5 presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the
6 drafting of their patents has been less than ideal." *Id.*; *see also Halliburton*, 514 F.3d at 1249-50
7 (holding that an accused infringer must show by clear and convincing evidence that "a skilled artisan
8 could not discern the boundaries of the claim based on the claim language, the specification and the
9 prosecution history, as well as her knowledge of the relevant art area"). HSI has not satisfied this
10 standard. As Golden Hour correctly notes, HSI's argument would render indefinite any claim
11 containing "capable of" because "any device is capable of any function if it is properly modified and/or
12 configured." *See* Pl.'s Reply at 14. Golden Hour, however, does not claim that its invention is capable
13 of anything beyond that what the '073 patent's claims and specification describe. In the contexts in
14 which "capable of" is used in the '073 patent, one skilled in the art would readily ascertain its meaning
15 as "able to." The Court adopts Golden Hour's construction.

### C.     "Dispatching"

       Independent claim 1 describes a "first module capable of *dispatching* an emergency transport
crew. . . ," 20:63-64 (emphasis added), and dependent claim 6 states that the "first module includes
instructions for *dispatching* a helicopter. . . ," 21:19-20. Golden Hour contends that the Court should
(1) construe "dispatching" in the phrase "capable of *dispatching*" as "able to issue a request to deploy
to a destination" and (2) construe "dispatching" in the phrase "instructions for *dispatching*" as
"computer software for issuing a request to deploy to a destination."[7] Golden Hour contends that its
definition of "dispatching" in both contexts is consistent with *The American Heritage Dictionary* (3d

---

[7] In the Joint Claim Construction and Prehearing Statement, the parties agreed to construe the term "instructions" in the dependent claim 7 language, "instructions for tracking" as "computer software," 21:21-23. The parties do not contest the use of this same construction in the context of dependent claim 6. The Court finds that the specification supports this construction because it describes the dispatch module to which the "instructions" language refers as computer software, which may exist on a server, a dispatch computer, or both. *See* 4:47-57.

7

1 ed. 1993), which defines "dispatch" as "to relegate to a specific destination or send on specific
2 business." *See American Heritage*, *supra*, at 400.  HSI contends that in both contexts "dispatching"
3 should be construed according to its ordinary and customary meaning and "consistent with what is
4 actually described by the specification of the '073 patent."[8] *See* Def. Br. at 21-22.  Alternatively, if the
5 Court cannot construe "dispatching" consistently with the specification without re-writing the claims
6 in which "dispatching" appears, HSI contends that the claims in which the term appears are indefinite.

7 The plain language of claim 1, describing a dispatch module that is "capable of dispatching an
8 emergency transport crew," 20:63-64, supports Golden Hour's construction that the dispatch module
9 plays an active role in the deployment of the crew.  Dependent claim 6, which states that the dispatch
10 module of claim 1 "includes instructions for dispatching a helicopter," 21:19-20, reinforces the notion
11 that the dispatch module actively participates in the deployment process.  In the case of both claims, the
12 plain language does not support HSI's construction that the dispatch module passively aids the human
13 dispatcher in documenting information relating to the deployment.  The specification, likewise, is
14 consistent with and supports Golden Hour's construction because, in its discussion of the dispatch
15 module's functions, the specification describes how the dispatch module is used to deploy various types
16 of emergency vehicles to destinations.  *See* 4:47-60 ("the dispatch computer . . . communicates with
17 software for collecting information on the patient encounter and scheduling and *deploying* a crew to
18 assist the injured patient.") (emphasis added).  Consistent with Golden Hour's construction, a person
19 with ordinary skill in the art would understand this embodiment of the invention to mean that the
20 dispatch module uses computer software that is capable of issuing a request to deploy a crew to a
21 destination, among other functions.  The specification does not necessarily preclude a human dispatcher
22 from playing a role in issuing the deployment request, but the specification does not *require* that a
23 human dispatcher play the active role and limit the dispatch module to the passive capacity of collecting
24 and tracking information that the human dispatcher inputs, as HSI argues.  The fact that the specification
25 describes embodiments of the dispatch module related to collecting and recording information does not

---

27 [8] HSI proposes this example of a construction of "dispatching" as consistent with the
specification: "a component of an integrated data management system that aids a dispatcher in
documenting information relating to sending an emergency transport crew to a patient incident requiring
28 emergency medical care by the emergency transport crew." Def.'s Br. at 22.

8

1 expressly limit the dispatch module's function to these more passive capacities in lieu of the capacity
2 to issue a deployment request, as HSI argues. *See* 6:11-7:8. Lastly, the general purpose dictionary
3 definition cited by Golden Hour, likewise, is consistent with the manner in which "dispatching" is used
4 in the claim language and described in the specification, namely "dispatching" as relegating to a specific
5 destination or sending on specific business.

6  The Court adopts Golden Hour's constructions for "dispatching" in both contexts ("able to issue
7 a request to deploy to a destination"/"computer software for issuing a request to deploy to a
8 destination") and notes that the parties in *Golden Hour v. emsCharts* agreed to these same
9 constructions.[9] *See Golden Hour*, 2008 WL 2557581, at *4.

### D. "Recorded"

Claim 1 describes a "first module capable of dispatching an emergency transport crew . . . wherein transportation tracking information relating to the dispatch is *recorded*." 20:63-67 (emphasis added). In the Joint Claim Construction and Prehearing Statement, the parties agreed to Golden Hour's proposed construction of "recorded" as meaning "automatically stored." However, the parties now disagree over the meaning of "automatically" in the proposed construction, "automatically stored." HSI interprets the term to mean that the tracking information is automatically *saved* by the computer program after it is manually inputted,[10] while Golden Hour understands it to mean that the tracking information that is automatically stored is *not* manually inputted into the system.

As Judge Ward noted, "the specification evinces that the patentee made a distinction between 'recorded' and 'automatically recorded' because both terms appear in the specification," *Golden Hour*, 2008 WL 2557581, at *6. *Compare* 6:43-45 ("The Flight submodule . . . *records* information pertinent

---

[9] Golden Hour's construction of "dispatching" does not require re-writing the claims, as HSI argues. Based on the specification, one skilled in the art would read the claim in the manner that Golden Hour's construction proposes. *Cf. Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (refusing to re-write claim to correct obvious error where patentee argued that one skilled in the art would understand his use of "perpendicular" to mean "parallel.").

[10] HSI further asserts that, as the patent fails to disclose the feature for automatically storing in the sense Golden Hour alleges, claim 1 would be invalid for lack of enablement or written description if the Court adopts Golden Hour's interpretation.

9

1  to the flight proper") *and* 6:64-65 ("Multiple flights can be orchestrated and *recorded* in parallel") *with*
2  6:59-60 ("*recorded automatically* from the information provided") (emphases added). Accordingly, the
3  specification does not indicate that "the term 'recorded' should be limited to data that is 'automatically'
4  recorded," *Golden Hour*, 2008 WL 2557581, at *6, nor does it indicate that the term "recorded" should
5  be limited to saving data that is manually input. The specification supports that the "term 'recorded'
6  as used in the claims refers to storing information." *Id.* The Court agrees with Judge Ward's
7  construction and construes the term "recorded" to mean "stored," *see id.*, thereby resolving the parties'
8  disagreement over the meaning of "automatically" in their initially agreed-upon construction.[11]

### E. "Shared database"

Dependent claim 8 states that the first and second modules described in independent claim 1 "communicate via a *shared database*." 21:24-25. Golden Hour contends that "shared database" requires no construction, or to the extent it does, the Court should construe the term according to its ordinary and customary meaning.[12] HSI contends that the Court should construe "shared database" as "a computer database containing data gathered from the multiple software modules, wherein the common data from the multiple modules is stored as a single logical record."[13]

The second portion of HSI's construction suffers from the same flaw noted above in the discussion of the term "integrated." The specification does not specify or require that the shared database's common data gathered from the multiple modules be "stored as a single logical record." Nothing in the claim language or any other intrinsic evidence supports HSI's construction that the data

---

[11] Even if it would be appropriate to consider HSI's invalidity argument at claim construction, the Court does not need to reach it because the Court does not adopt Golden Hour's interpretation.

[12] Golden Hour cites *The American Heritage Dictionary* (3d ed. 1993), which defines "share" as "to participate in, enjoy, or experience with another or others" and "database" as "a collection of data arranged for ease of retrieval. *See American Heritage*, *supra*, at 353, 1253.

[13] HSI further contends that claim 8 specifically requires one literal database for the multiple modules.

10

gathered from the multiple modules *must* be "stored as a single logical record."[14]

However, the specification clearly indicates that the system's shared database can store data received from its multiple modules and make that data available to other modules, *see* '073 patent, 4:47-5:26, 5:67-6:4. Thus, the specification's discussion of how the shared database functions, together with the plain language utilized in the claim, do support the first portion of HSI's proposed construction, namely that a "shared database" means "a computer database containing data gathered from the multiple software modules." As Golden Hour "does not necessarily disagree" with this portion of HSI's construction, *see* Pl.'s Reply at 9, the Court adopts it and construes "shared database" to mean "a computer database containing data gathered from multiple modules."[15]

### F. "Integrating"

Independent claim 15 describes a "computerized method of generating a patient encounter record" comprising steps that include "*integrating* the patient information with the flight information to produce an encounter record indicative of the patient's clinical response." 21:54-22:6 (emphasis added). Golden Hour asserts that, to the extent that "integrating" in this context requires construction, the Court should construe it according to its ordinary and customary meaning, again citing the general purpose dictionary's definition of "integrate" discussed above. *See American Heritage*, *supra*, at 706 (defining "integrate" as meaning "join with something else; unite"). HSI contends that, as used here, "integrating" is indefinite and, in the alternative, that the Court should construe "integrating the patient information" to mean "collecting all information related to a patient incident in a shared database." *See* Def.'s Br. at 15.

Here, the claim language does not support HSI's construction because it does not describe the patient encounter record as being generated in a *shared database*, but rather that the collected patient and flight information is integrated in the sense of producing a patient encounter record. Further, the

---

[14] As noted above, HSI does not define "single logical record" or explain the source from which it derived this language.

[15] With respect to HSI's contention that claim 8's "shared database" be construed as specifically requiring one literal database for the multiple modules, the Court notes that HSI points to no intrinsic or extrinsic evidence supporting this limitation.

11

specification does not *require* that the invention utilize a *shared database* to produce "complete and accurate chart documentation and maintain[] internal consistency between separate modules."[16] 3:45-47. Rather, as Judge Ward reasoned, the specification explicitly states that the present invention, as distinct from prior art, "integrates all aspects of patient record documentation into a single complete electronic chart." 3:21-23. In light of the intrinsic evidence, the Court agrees with Judge Ward and construes "integrating" in this context to mean "combining."[17] *See Golden Hour*, 2008 WL 2557581, at *6.

## CONCLUSION

For the foregoing reasons, the Court hereby adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: July 22 , 2008

SUSAN ILLSTON
United States District Judge

---

[16] HSI also reiterates its "single logical record" argument to contend that the method described here could only work if the "integrating" is implemented in the sense of sharing data as a "single logical record." As noted above, the Court finds that the intrinsic evidence does not support this construction.

[17] As a person skilled in the art would understand "integrating" in this context to mean "combining," the term "integrating" is not indefinite. *Cf. Halliburton*, 514 F.3d at 1250; *see also Exxon*, 265 F.3d at 1375.